# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 24 2018, 5:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Carlos I. Carrillo
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parental Rights of:

A.R. and P.H. (Children),

and,

L.H. (Mother),
*Appellant-Respondent,*

v.

Indiana Department of Child Services,

January 24, 2018

Court of Appeals Case No.
79A02-1708-JT-1780

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No.
79D03-1702-JT-12
79D03-1702-JT-13

*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

L.H. ("Mother") appeals the termination of her parental rights to her children, A.R. and P.H. We affirm.

# Issue

The sole issue before us is whether there is sufficient evidence to support the termination of Mother's parental rights.

# Facts

Mother gave birth to A.R. in June 2013 and P.H. in September 2014.[1] On July 3, 2015, the Tippecanoe County Office of the Department of Child Services ("DCS") received a report that Mother was living with a new boyfriend who

---

[1] A.R.'s father's parental rights were also terminated; he is not a party to this appeal. P.H.'s father did not contest the termination; he is not a party to this appeal.

dealt drugs. An investigation revealed that Mother, A.R., and P.H. were living with her boyfriend, J.E., and his parents. DCS administered drug tests to Mother, who tested positive for amphetamine, methamphetamine, and marijuana. A.R. tested positive for amphetamine, and P.H. tested positive for amphetamine, methamphetamine, cocaine, and marijuana. Mother admitted that for a seven-month period, she had used methamphetamine on a weekly basis in the home while her children were present.

[4] On July 13, 2015, DCS took the children into protective custody. The following day, DCS filed a Child in Need of Services ("CHINS") petition regarding A.R., who was adjudicated a CHINS on September 1, 2015. The trial court removed A.R. from Mother and made her a ward of DCS on September 29, 2015. P.H. was also removed and found to be a CHINS.

[5] On October 5, 2015, pursuant to dispositional orders, Mother was ordered to participate in services, including "home based case management services, substance abuse assessment and treatment, mental health assessment, medication evaluation, individual therapy, parenting time, and random drug screens." App. Vol. II p. 46. The trial court conducted permanency hearings on November 15, 2016, and January 31, 2017. On February 1, 2017, DCS filed verified petitions to terminate Mother's parental rights to A.R. and P.H. The trial court held a hearing on the petitions on April 13, 2017.

[6] At the hearing, DCS family case manager Lauren Wheeler testified that, with the exception of "a brief time" from March 2016 through August 2016,

including a "spotty" July 2016, Mother failed to "consistently participate[ ]" in services required under the case plan during the CHINS period. Tr. Vol. II p. 64, 65. Wheeler testified that, "[s]ince the latter part of 2016 and into [2017,] there's been little to no engagement in services" from Mother. *Id.* at 66. Wheeler testified that despite Mother's obligation to maintain regular contact, Mother communicated "inconsistent[ly]" and eventually stopped communicating with Wheeler altogether in December 2016. *Id.* at 71.

[7] Regarding case management services offered to Mother, Wheeler testified that Mother was discharged from seven service providers and required new referrals due to having been discharged for inadequate engagement. "[Mother]'s been referred for three substance use assessments, two clinical interviews, three different therapists, and then a few different . . . visit facilitators[.]" *Id.* at 73. Wheeler explained that the reason for each new referral was Mother's being discharged from the previously referred service for "lack of participation and compliance" and for "no shows[] [for] their intake[s] or appointments [and] did not communicate or show up to . . . rescheduled visits[.]" *Id.* at 81-82. Wheeler testified further that, but for "[c]ounseling partners [who] kept the [Mother] on . . . for the sake of the children so that they were not continually being put through different providers" in their lives, "there would have been more" new referrals required due to discharges in Mother's case. *Id.* at 74.

[8] Wheeler testified that she had grave concerns regarding Mother's relationship with J.E., which was typified by

a lot of domestic violence, lots of reports of drinking, um substance use. Uh [Mother] had been to multiple shelters returning to [J.E.] each time. Um, as well as the ongoing substance use has occurred with them together in whichever home they're in at the time.

*Id*. at 70. Wheeler testified further that Mother and J.E. still abuse the very substances that prompted DCS's removal of the children and for which the children tested positive. Regarding her inability to recommend placing the children with J.E.'s parents, Wheeler testified,

> . . . [T]he biggest concern is that . . . [Mother] and [J.E.] have been in [J.E.'s parents'] home for a majority of the case. And the house they moved into was still provided by [J.E.'s parents] and there was never any proof that [Mother and J.E.] were actually paying rent or supporting themselves. So, it would be [DCS's] concern that [Mother and J.E.] would right [sic] back in that home and there would be no boundaries kept.

*Id*. at 75. Wheeler testified that termination of Mother's parental rights was in the children's best interest; and that the conditions that resulted in the children's removal had not been remedied. She also testified that the impact to the children would be as follows if the trial court did not terminate Mother's parental rights to A.R. and P.H.:

> [A.R. and P.H.] would be going back to a home with no stability, no structure, no appropriate discipline, uh substance abuse exposure, uh domestic, possible domestic violence still, um everything that has been going on throughout the entire case, basically.

*Id*. at 76.

[9] Anna Gallardo, a case manager and visit facilitator for Counseling Partners, testified that Mother, the children, and J.E were referred to her in December 2015. Gallardo testified that she would rate Mother's success with services as a "D" on an "A-F" scale because Mother:

> failed to comply with services, therefore, she was discharged two times from visitations. She was also discharged from case management services. So, she did not successfully complete her visits or case management three times.

> * * * * *

> . . . [F]or her to be able to complete her services she would've had been able to do all her visits. There were times where she did do her visits . . . , but then she had setbacks. And then she was following visits and then she had setbacks. So, there was never a full uh consistent uh visits [sic] that I could document.

*Id*. at 93, 94. Gallardo also testified that she was concerned with Mother's "inability . . . to provide for the children's needs"; with Mother's forgetting to bring vital items to the visits for her child with special needs[2]; and with Mother's requiring constant reminders and failing to complete tasks "that needed . . . follow through." *Id*. at 94.

---

[2] This child is the younger half-sibling of A.R. and P.H. and was not a party to the instant termination proceeding.

Gallardo testified that she had kept Mother in the Counseling Partners program "believing that she was capable of completing services," because of "some improvements" Mother had displayed in the areas of discipline, patience, handling the children's outbursts, and yelling; "but then [Mother] would have setbacks," including regressing in areas in which she had previously shown promise and returning to problematic behaviors. *Id.* at 95. Gallardo testified that she believed she had done everything she could to assist Mother, but felt that Mother simply could not demonstrate sustained improvement.

John Catron, clinical manager for Bauer Family Resources and administrator of the Living in Balance IOP substance abuse treatment program, testified that Mother was referred to the program, which meets "three times a week, two hours each time" for approximately three months; "it's then followed by the aftercare group which is once a week for [twelve] one hour" sessions. *Id.* at 104. The Living in Balance program is meant to "deal . . . with triggers and . . . education on how to manage emotions and things that typically bring about a relapse." *Id.* at 107. He testified that Mother did well initially; she communicated well with him from March 2016 through August 2016, completed her homework assignments, complied with drug screen requests, and did not test positive during the program; however, she failed to complete program because "she did not . . . return to group" after July 2016. *Id.* at 105. He testified as follows:

> [Mother] had indicated a few sessions into aftercare that she had a new job that was going to interfere with the group time. So, I

> had set it up for the case manager. . . to meet with her
> individually to finish the program.

*Id*. Catron testified that, despite his efforts to accommodate her, Mother failed to return to complete the Living in Balance program, and she relapsed in November 2016.

[12] At the time of the termination hearing, Mother—who was approximately sixteen weeks pregnant—acknowledged in her testimony that she was unable to offer a safe, stable, and drug-free home for A.R. and P.H., and asked the trial court to place the children with J.E.'s parents. Mother testified that: (1) she "no-showed" for so many drug screens in January and February 2017 that her visitation privileges were restricted; (2) her drug use continued into the CHINS period, and she tested positive for methamphetamine in November 2016; (3) she failed to complete a post-relapse substance use assessment; (4) she disregarded six requests between January 2017 and April 2017 for hair screens for drug use; (5) she failed to keep in communication with family case manager Wheeler and failed to provide her new telephone number to DCS; (6) she started, but did not complete, IOP; (7) she was inconsistent in her engagement in services during the CHINS period; and (8) she did not have stable housing at the termination hearing.[3]

---

[3] At the termination hearing, J.E. testified that he and Mother were living in a motel; Mother testified that the night before the hearing, she stayed "at a family members' [sic]." *Id*. at 39.

J.E. testified that: (1) he and Mother were living in a motel at the time of the termination hearing; (2) he was arrested for possession of methamphetamine and public intoxication endangering himself and others mere days before the termination hearing; (3) he missed at least five case plan mandated drug screens and at least six requests for hair screens; (4) he failed to maintain contact with family case manager Wheeler for the two-month period immediately preceding the termination hearing; (5) he tested positive for alcohol and marijuana;[4] (6) he was discharged from the service program he was referred to for domestic violence for poor attendance; (7) he was discharged by three therapists for noncompliance; (8) he and Mother had a "kinda unstable relationship," were trying to better themselves, were "capable of more," but "just need some help," *id*. at 26; and (9) placement with his parents would provide A.R. and P.H. with stability and permanency.

On July 7, 2017, the trial court entered an order for involuntary termination of parental rights, containing extensive findings, terminating Mother's parental rights to A.R. and P.H. She now appeals.

## Analysis

Mother contends that there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and

_____

[4] J.E. also tested positive for cocaine during the CHINS period.

raise their children. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children,* 796 N.E.2d 280, 285 (Ind. 2003)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*). Courts need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied.* "Rather, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate." *Id.*

[16] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.,* 934 N.E.2d at 1132. We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial

Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights, as required by Indiana Code Section 31-35-2-8(c). *See In re N.G.,* 61 N.E.3d 1263, 1265 (Ind. Ct. App. 2016). When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *In re I.A.,* 934 N.E.2d at 1132. We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[17] Indiana Code Section 31-35-2-8(a) provides that, "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind. 1992).

[18]    Here, the trial court found that continuation of the parent-child relationships posed a threat to A.R. and P.H. Mother disputes that finding.[5] When considering whether there is sufficient evidence to support such a finding, trial courts must "consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 152 (Ind. 2005). "At the same time, however, a trial court should judge a parent's fitness to care

---

[5] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is sufficient evidence that continuation of the parent-child relationship posed a threat to A.R. and P.H.'s well-being and need not consider whether there is a reasonable probability that the conditions resulting in the children's removal from Mother's care would not be remedied. *See In re B.J.,* 879 N.E.2d 7, 20 (Ind. Ct. App. 2008).

for his [or her] child as of the time of the termination proceeding, taking into consideration evidence of changed conditions." *Id.*

[19] The trial court made extensive findings regarding Mother's history of severe drug use and addiction as follows:

> 4.  Mother acknowledged her struggles with methamphetamine and marijuana inhibited her ability to care for the children.  . . . .
>
> * * * * *
>
> 13.  Mother completed a substance abuse assessment which indicated a high probability of a substance dependence disorder. Mother failed to complete recommended substance abuse treatment.  After a brief period of sobriety during 2016, Mother relapsed on methamphetamine in November of 2016. Thereafter, Mother failed to submit to requested drug screens again until March of 2017.  Mother missed multiple drug screens throughout the CHINS case, including three (3) in April of 2017.

App. Vol. II pp. 46, 48.  The trial court also made findings regarding issues of recurring domestic violence in her relationships,[6] and problematic aspects of her relationship with J.E., including his physical violence toward Mother, his own drug use, and the instability of their housing as follows:

> 11.  Prior to the CHINS case, Mother living in Las Vegas where both children were born.  Mother moved to Lafayette, Indiana in

---

[6] The trial court's findings included references to Mother being physically abused in her previous relationship by A.R.'s father, who admitted his relationship with Mother "included physical fights and Mother reported[ly] feeling unsafe with him."  App. Vol. II p. 26.

May of 2015 and started dating [J.E.] the same month. After a couple of weeks of dating, Mother and the children moved into the home with [J.E.] and his parents. After domestic violence incidents, Mother stayed in shelters but returned a few days later each time. In February of 2017, Mother and [J.E.] moved to Terre Haute and lived in a house owned by [J.E.]'s relatives until it was burglarized. Thereafter, Mother and [J.E.] stayed in hotels or with [J.E.]'s parents. Mother never obtained safe and stable housing independent of [J.E.]. . . . .

12. Mother completed a clinical assessment reporting issues of depression, anxiety and possible bipolar disorder. Mother disclosed she had to be taken to the hospital after the children's removal due to punching holes in the wall. Mother also reported breaking [J.E.]'s window with a bat and a brick after he shattered her phone. Mother acknowledged that her anger issues make it difficult to discipline.

* * * * *

16. Mother continued a relationship with [J.E.] despite domestic violence and [J.E.]'s ongoing drug use. During the CHINS case, Mother became pregnant by [J.E.] and gave birth in June of 2016 to a child that was also removed from the home. Mother had only recently started participating in services and [J.E.] tested positive for cocaine and marijuana. At the time of the evidentiary hearing, Mother was again pregnant by [J.E.].

17. DCS provided services to [J.E.] including a Family Functioning Assessment which indicated a history of domestic violence as well as drug and alcohol abuse. [J.E.] completed a psychological evaluation but failed to complete a substance abuse assessment. [J.E.] continued to test positive for cocaine, methamphetamine, marijuana, and alcohol. [J.E.] failed to submit to all requested drug screens.

18. [J.E.] has been convicted of Operating a Vehicle While Intoxicated at least twice but continues to drink. Mother expressed concern that [J.E.]'s drinking increased after her children were removed and that he is an angry drunk. [J.E.] was arrested a few days before the evidentiary hearing for Public Intoxication and Possession of Methamphetamine.

19. During assessments, [J.E.] was dishonest regarding a previous substantiation for sexual abuse of a minor and failed to mention Mother's pregnancy. [J.E.] participated only sporadically in recommended case management and was discharged from unsuccessfully from Character Restoration due to multiple absences. [J.E.] failed to attend recommended counseling at all.

*Id*. at 47, 48. The trial court also entered findings regarding instability of Mother's employment, noting that "[she] was employed for a brief period only and is financially dependent upon [J.E.] and his parents for her own basic needs." *Id*. at 47. Lastly, the trial court entered findings regarding Mother's inconsistency and lack of engagement with DCS's case plan as follows:

6. Pursuant to the dispositional orders issued on October 5, 2015, Mother was offered the following services: home based case management services, substance abuse assessment and treatment, mental health assessment, medication evaluation, individual therapy, parenting time, and random drug screens.

\* \* \* \* \*

9. The children have remained out of the home for over six (6) months from the dispositional order. In fact, the children have been out of the home for more than fifteen (15) of the most recent twenty-two (22) months.

10. Mother was offered home based case management services to address her stability issues with housing and employment. Mother failed to engage in case management services for most of the CHINS case. Mother was discharged from approximately seven (7) different providers for lack of engagement and failure to follow through with appointments.

* * * * *

14. Mother also failed to complete individual counseling. Mother was discharged unsuccessfully. Mother never completed a recommended medication evaluation.

15. Mother missed numerous visits throughout the CHINS case which sometimes resulted in not seeing the children for a month at a time. Mother's visits never progressed beyond semi-supervised due to inconsistent attendance and parenting issues. Mother struggled to handle the children's outbursts often yelling and restraining the children. Mother showed some temporary progress with discipline and patience but could not sustain improvements. Mother left the children unattended and failed to provide for basic needs including diapers, wipes, sippy cups, and meals. Mother's last visit was in December of 2016 after a positive drug screen for methamphetamine. Mother was unable to provide clean drug screens for thirty (30) days in order to reinstate visits.

*Id.* at 46, 47-48. We cannot say the foregoing findings, which Mother does not challenge and which reflect the trial court's weighing of the evidence and judging of witness credibility, are clearly erroneous.

[20] The record reveals that the children were removed from Mother's care in July 2015 because she was abusing drugs and living with an alleged drug dealer. She

admitted that she had used drugs in her home while the children were present. At the time of removal, A.R. tested positive for methamphetamine, and P.H. tested positive for amphetamine, methamphetamine, cocaine, and marijuana. Mother's drug use continued after the CHINS adjudication, as evidenced by her November 2016 relapse due to her methamphetamine use. J.E., too, testified that he continued to use illicit drugs during the CHINS period, testing positive for cocaine, methamphetamine, marijuana, and alcohol during the CHINS period. Mother and J.E. also admitted to issues of domestic violence in their relationship. Given Mother's failure to complete recommended substance abuse treatment after her children were removed from her care for testing positive for various illicit drugs, her shaky hold on sobriety, her involvement with a partner whose substance abuse is ongoing, and the volatility of her relationship with J.E., we agree with the trial court that allowing continuation of Mother's parent-child relationships with A.R. and P.H. could threaten harm to them. The trial court's findings on this issue were not clearly erroneous.

[21] Mother also contends that termination is not in A.R.'s and P.H.'s best interests. When considering whether there is sufficient evidence that termination of parental rights is in a child's best interests, we consider the totality of the evidence and look beyond the factors identified by DCS. *In re J.C.,* 994 N.E.2d 278, 289-90 (Ind. Ct. App. 2013). The interests of the parents must be subordinated to the needs of the child. *Id.* at 290. Recommendations of DCS caseworkers and court-appointed special advocates, combined with evidence that continuation of the parent-child relationship poses a threat to the child, are

sufficient to prove by clear and convincing evidence that termination is in a child's best interests. *Id.* Children have a paramount need for permanency, which is a central consideration in evaluating a child's best interests. *In re E.M.,* 4 N.E.3d 636, 647-48 (Ind. 2014).

[22] Family case manager Wheeler testified that it was in the best interests of A.R. and P.H. for Mother's parental rights to be terminated and that the children should remain with their foster parents, where the children had been for more than half of their lives. As Wheeler testified, if the trial court did not terminate Mother's parental rights to A.R. and P.H.,

> [A.R. and P.H.] would be going back to a home with no stability, no structure, no appropriate discipline, uh substance abuse exposure, uh domestic, possible domestic violence still, um everything that has been going on throughout the entire case, basically.

Tr. Vol. II at p. 76. Mother, too, acknowledged her inability, at the time of the termination hearing, to provide a safe, stable, and drug-free home for A.R. and P.H., despite having received extensive support and services.

[23] At the time of the termination hearing, A.R. and P.H.—who were nearly four and nearly three years old, respectively—had been out of Mother's home for nearly two years. Given Mother's minimal progress regarding her drug addiction, including her inability to refrain from drug use during the CHINS period; her violent relationship with J.E., who also abused drugs; their unstable housing circumstances; Mother's spotty engagement in vital services; and her

general inability to care for and provide for the children, it is unclear how long A.R. and P.H. would have to wait for those conditions to improve, if at all. We conclude that there is sufficient evidence to support the trial court's finding that termination of Mother's parental rights was in A.R. and P.H.'s best interests.

## Conclusion

[24] There is sufficient evidence to sustain the termination of Mother's parental rights to A.R. and P.H. We affirm.

[25] Affirmed.

Najam, J., and Mathias, J., concur.